UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PML NORTH AMERICA, LLC,

        Plaintiff,

                                        Case No. 05-CV-70404-DT

v.

                                        Hon. Robert H. Cleland

HARTFORD UNDERWRITERS INSURANCE
COMPANY, ACG ENTERPRISES OF NC, INC.,
and JOHN E. GILCHRIST d/b/a RTP INSURANCE
& FINANCIAL ASSOCIATES OF DURHAM, NC,

        Defendants.

---

## PLAINTIFF'S MOTION FOR JUDGMENT BY DEFAULT AND SUMMARY JUDGMENT AGAINST DEFENDANT ACG ENTERPRISES OF NC, INC.

Plaintiff PML North America, LLC ("PML") moves this Court pursuant to Fed. R. Civ. P. 37 to issue a judgment by default against Defendant ACG Enterprises of NC, Inc. ("ACG") and pursuant to Fed. R. Civ. P. 56 to issue an order granting PML summary judgment. Pursuant to L.R. 7.1, PML states that it sought, but did not receive, ACG's concurrence with this Motion.

First, ACG violated this Court's Order compelling ACG to produce certain computer equipment. ACG failed to produce the requested USB Storage Device identified as "Disk&Ven_Memorex&Prod_ThumbDrive&Rev_1.11," which was used on Mr. Brown's laptop and one of ACG's desktop computers; and ACG failed to produce the critical hard drive identified as 40GB IBM Deskstar HD, model IC2N040ATCS04-0, which was used on Carlos Brown's laptop as recently as April 2005.

Second, the forensic examination of ACG's hard drives has uncovered ACG's intentional and willful destruction of evidence after the commencement of this litigation. ACG reformatted two hard drives from the computer in the front-desk area of ACG and a desktop computer assigned to "Quinton," one of ACG's employees. The reformatting of these hard drives occurred on July 21, 2005 and September 8, 2005 – after ACG was added as a defendant in this case in May 2005. The reformatting and reloading of the operating system on these hard drives overwrote files and rendered files irretrievable. Moreover, ACG destroyed the external storage drive. ACG produced the external storage drive for inspection following an evidentiary hearing where Carlos Brown, president and owner of ACG, denied knowledge of its existence, yet the drive was tampered with, and as a result, it was inoperable.

Third, even though ACG failed to produce equipment and intentionally and willfully hid and destroyed other computer evidence, PML's expert located fraudulent certificates of insurance and the subject insurance coverage letter were located on ACG's computers in Word format. The certificates discovered on ACG's computers used the same form as the subject fraudulent certificates sent to PML. ACG had no authority or license to issue and create certificates of insurance. These documents, in conjunction with the document "How to Create a Certificate of Insurance," demonstrate that there is no genuine issue of material fact as to ACG's fraudulent conduct, namely the creation of fraudulent certificates of insurance and insurance coverage letter.

WHEREFORE, for the reasons discussed more fully in the attached Brief in Support and the exhibits attached thereto, PML respectfully requests that this Court grant its Motion to for Judgment by Default and Summary Judgment against ACG.

/s/    Katherine D. Goudie
Michael G. Latiff (P51263)
Katherine Donohue Goudie (P62806)
150 West Jefferson, Suite 100
Detroit, MI 48226-4450
(313) 225-7000
E-mail: latiff@butzel.com
       goudie@butzel.com
Attorneys for Plaintiff

Dated: October 20, 2006

/877124/

3

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PML NORTH AMERICA, LLC,

              Plaintiff,

                                      Case No. 05-CV-70404-DT

v.

                                        Hon. Robert H. Cleland

HARTFORD UNDERWRITERS INSURANCE
COMPANY, ACG ENTERPRISES OF NC, INC.,
and JOHN E. GILCHRIST d/b/a RTP INSURANCE
& FINANCIAL ASSOCIATES OF DURHAM, NC,

              Defendants.

---

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR
JUDGMENT BY DEFAULT AND SUMMARY JUDGMENT
AGAINST DEFENDANT ACG ENTERPRISES OF NC, INC.**

**STATEMENT OF THE ISSUES PRESENTED**

I.  Whether this Court should enter a judgment by default against Defendant ACG as a sanction pursuant to Fed. R. Civ. P. 37 when Defendant ACG disobeyed the Court's September 21, 2006 Order Granting Plaintiff's Motion to Compel Production of Certain Computer Equipment and when there is clear evidence that Defendant ACG willfully destroyed evidence?

Plaintiff PML answers:      Yes


II. Whether this Court should grant Plaintiff PML summary judgment pursuant to Fed. R. Civ. P. 56 when there is no genuine issue of material fact that Defendant ACG created the fraudulent certificates of insurance and workers' compensation insurance coverage letter?

Plaintiff PML answers:      Yes

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

### ISSUE I

**Cases:**

>  *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067 (6th Cir. 1990)
>
>  *Brenner v. Kolk*, 226 Mich. App. 149, 573 N.W.2d 65 (2002)
>
>  *Helmac Prod.'s Corp. v. Roth (Plastics) Corp.*, 814 F. Supp. 560 (E.D. Mich. 1992)
>
>  *Kucala Enters., Ltd. v. Auto Wax Co., Inc.*, 2003 U.S. Dist. LEXIS 8833 (N.D. Ill. 2003)
>
>  *Regional Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150 (6th Cir. 1988)
>
>  *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004) ("*Zubulake V*")

**Court Rules:**

>  Fed. R. Civ. P. 37(b)(2)(C)

### ISSUE II

**Cases:**

>  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)
>
>  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)
>
>  *Kuebler v. Equitable Life Assur. Soc'y of the United States*, 219 Mich. App. 1; 555 N.W.2d 496 (1996)
>
>  *Thomas v. Leja*, 187 Mich. App. 418; 468 N.W.2d 58 (1991)

**Court Rules:**

>  Fed. R. Civ. P. 56

## TABLE OF CONTENTS

STATE OF THE ISSUES PRESENTED……………………………………………ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY…………………………iii

STATEMENT OF MATERIAL FACTS…………………………………………...vi

INTRODUCTION…………………………………………………………...1

STATEMENT OF RELEVANT FACTS…………………………………………2

    I.   FACTUAL BACKGROUND……………………………………………2

        A.  PML Contracted with ACG to Obtain Workers' Compensation
            Insurance……………………………………………………......2

        B.  ACG Delivered Certificates of Insurance and a Coverage Letter
            to PML in an Attempt to Satisfy PML's Repeated Requests for the
            Insurance Policy…………………………………………………...3

        C.  PML Discovered That It Did Not Have the Required Workers'
            Compensation Insurance………………………………………......4

    II.  COMPUTER INSPECTION AND COURT'S ORDER………………………5

        A.  ACG Intentionally Withheld Computer Equipment from Production……………5

        B.  ACG Violated This Court's Order by Failing to Produce Certain
            Computer Equipment………………………………………………6

            1.  USB Storage Device……………………………………………6

            2.  Hard Drive Used with Brown's Laptop……………………………6

        C.  ACG Willfully and Intentionally Destroyed Evidence…………………………7

            1.  ACG Reformatted and Rewrote Hard Drives after Litigation
               Commenced, Thereby Rendering Files Irretrievable…………………………7

            2.  ACG Tampered with and Destroyed the External Storage Drive…………….7

        D.  Critical Documents Were Located on ACG's Computers in Word
            Format…………………………………………………………10

            1.  Fraudulent Certificates of Insurance……………………………….10

2.  Fraudulent Insurance Coverage Letter……………………………………....11

3.  "How to Produce a Certificate of Insurance"……………………………..11

ARGUMENT………………………………………………………………………………13

I.  THIS COURT SHOULD ENTER A JUDGMENT BY DEFAULT
AGAINST ACG AS A SANCTION PURSUANT TO FED. R. CIV. P. 37
FOR ACG'S VIOLATION OF THIS COURT'S ORDER AND WILLFUL
DESTRUCTION OF EVIDENCE………………………………………………...13

II.  THIS COURT SHOULD GRANT PML SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56………………………………………………17

A.  Standard of Review under Fed. R. Civ. P. 56……………………………17

B.  There Is No Genuine Issue of Material Fact That ACG Created the
Fraudulent Documents………………………………………………………...18

CONCLUSION……………………………………………………………………………20

<u>**STATEMENT OF MATERIAL FACTS**</u>
**Pursuant to April 21, 2006 Scheduling Order, § 7(g)**

1.  PML is the majority owner of numerous professional employer organizations ("PEOs"). (First Amended Complaint ("Compl."), ¶ 7.)

2.  ACG offered its services to PML to obtain and provide workers' compensation insurance for PML because ACG represented that it had the ability to obtain such insurance for PML and its PEOs. (**Exhibit A**, Responses to ACG's First Set of Interrogatories, p. 5.)

3.  ACG assured PML that it could obtain the workers' compensation insurance PML needed for its PEOs located in various states. (Compl., ¶ 10.)

4.  Based on these assurances, PML entered into a "Workers' Compensation Coverage Agreement" with ACG on November 17, 2004, for ACG to obtain and provide workers' compensation insurance to PML. (**Exhibit B**, Agreement.)

5.  PML requested that ACG provide the workers' compensation insurance policy on multiple occasions, and ACG informed PML that the policy would be arriving via mail. (*See* **Exhibit C**, PML Responses to ACG's Second Set of Interrogatories, pp. 7-8.)

6.  PML, however, never received the policy or the declaration of insurance page despite its repeated requests until after it initiated this action against The Hartford. (*Id.*)

7.  In December 2004, ACG began to send certificates of insurance to PML, which demonstrated that PML had obtained insurance coverage for its PEOs and their customers. (**Exhibit D**, Certificates of Insurance.)

8.  The certificates listed RTP as the insurance broker and The Hartford as the insurer. Each certificate was signed by "Michael Carrow" of The Hartford. The fax transmittal footers on these documents also demonstrated that ACG sent the documents via fax to Michael Peterson of Worldwide Personnel Services of Virginia (fax number 540-667-1984), one of PML's PEOs. (*Id.*)

9.  On December 8, 2004, PML's coverage was further confirmed in a letter from an account manager underwriter, "Michael Carrow," at The Hartford that ACG faxed to PML. (**Exhibit E**, 12/8/04 Coverage Letter.)

10.  PML subsequently paid in excess of $38,000.00 in premiums to ACG for the Hartford policy. (*See* **Exhibit F**, records of payments to ACG.)

11.  The Hartford advised PML that the certificates of workers' compensation insurance and coverage letter that ACG provided to PML were fraudulent, and that there was no one by the name of "Michael Carrow" who worked for The Hartford or St. Paul's Travelers, which serviced The Hartford's customers.  (*See* **Exhibit G**, Hutchins Affidavit.)

12.  Indeed, there was an employee who worked for St. Paul's Travelers by the name of Michelle Hutchins, whose maiden name was Carrow.  (*Id.*)

13.  Mr. Bishop, counsel for ACG, advised PML that he had reviewed the policy, which was not provided to PML at the time, and that PML should enter into a new contract with ACG.  Mr. Bishop suggested to PML that is should assign its members' employees into ACG's staffing company, so that ACG could claim they were temporary staffing employees to obtain coverage.  (**Exhibit C**, Responses to Second Set of Interrogatories, pp. 7-8; **Exhibit H**, 1/25/06 Letter & Response.)

14.  The policy obtained by ACG was a small pool policy for ACG as a janitorial staffing company that only covered employees of ACG who were employed in North Carolina.  (**Exhibit I**, Policy.)

15.  PML refused to agree to enter into a new contract and/or assign any employees to ACG.  (*See* **Exhibit H**.)

16.  On June 21, 2006, counsel for PML and PML's computer forensic expert, J. Stott Matthews, traveled to ACG's place of business in Durham, North Carolina to conduct the computer inspection and create mirror images of all data storage devices; and ACG produced five hard drives for inspection and copying.  (*See* **Exhibit J**, 8/18/06 Expert Report.)  PML discovered that ACG withheld production of certain equipment.  (*Id.*)

17.  After holding an evidentiary hearing on PML's Motion to Compel, the Court entered an Order Granting Plaintiff's Motion to Compel Production of Computer Equipment on September 21, 2006.  (**Exhibit K**, Order.)

18.  The Belkin USB storage device, which was provided by ACG at the motion hearing, however, was not the device that this Court ordered ACG to produce.  (*See* **Exhibit L**, 9/29/06 Expert Report, p. 4.)

19.  The USB storage device identified as "Disk&Ven_Memorex&Prod_ThumbDrive&Rev_ 1.11" has not been produced by ACG.  (**Exhibit J**, 8/18/06 Expert Report, p. 12.)

20.  ACG also failed to produce the key hard drive identified as "40GB IBM Deskstar HD, model IC2N040ATCS04-0," which was used on Carlos Brown's laptop computer during the relevant time period of November 2004 through April 2005.  (*See* **Exhibit J**, 8/18/06 Expert Report, p. 13; **Exhibit M**, Hearing Tr., pp. 28-29.)

21.  ACG reformatted and cleared out the 9.1 GB Seagate Drive from ACG's front desk computer and 40GB Maxtor hard drive from the desktop computer of "Quinton." (**Exhibit L**, 9/29/06 Expert Report, p. 3.)

22.  As a result of this reformatting, Mr. Matthews concluded that ACG overwrote and destroyed key data on those hard drives. (*Id.*)

23.  PML's expert, J. Stott Matthews, received a storage drive from ACG pursuant to this Court's Order. (**Exhibit O**, 10/6/06 Expert Report, p. 2 & photos.)

24.  The storage drive had been tampered with, and as a result, "the drive failed to spin up or otherwise show any functionality." (*Id.*)

25.  Metadata demonstrated that a storage drive was used as recently as May 22, 2006 – one month prior to the computer inspection. (**Exhibit L**, 9/29/06 Expert Report, pp. 5-6.)

26.  On September 18, 2006, Mr. Brown testified under oath at the evidentiary hearing that he did not retain any certificates of insurance on his computers in ACG's office. (**Exhibit M**, Hearing Tr., p. 82.)

27.  Fraudulent certificates of insurance, in Word format, were located that were identical in format (e.g., 1998 ACCORD form) to the fraudulent certificates that were sent to PML in December of 2004. (**Exhibit J**, 9/29/06 Expert Report, pp. 12-14.)

28.  PML located the fraudulent coverage letter it received from ACG on Mr. Brown's hard drive as a Word document. (*See* **Exhibit S**, Coverage Letter found on ACG's computers; **Exhibit J**, pp. 14-15.)

29.  The fax transmittal "header" was merely a Word header in which ACG could type in a date, time, and fax number to falsely claim that the document was faxed by Hartford or RTP. (*Id.*)

30.  The "How to Produce a Certificate of Insurance" document, which was also discovered on ACG's computers, contained a written plan of ACG's fraudulent scheme to create false certificates of insurance. (**Exhibit U**.)

31.  This document instructs an ACG employee how to create a fake "fax line." (*Id.*)

32.  The metadata for this document states that it was created by Charles Thomke, employee of ACG, and last saved by Carlos Brown on February 18, 2005. (**Exhibit J**, 8/18/06 Expert Report, p. 18.)

## INTRODUCTION

This case involves the creation of fraudulent certificates of insurance and an insurance coverage letter, which falsely indicated that Plaintiff PML North America, LLC ("PML") had workers' compensation insurance coverage for itself, its professional employment organizations, and their clients. Defendant ACG Enterprises of NC, Inc. ("ACG"), the party with which PML contracted for insurance coverage, has created road blocks throughout the discovery process by attempting to hide, and then by destroying, damaging evidence. Indeed, in its attempts to thwart PML's discovery of critical evidence, ACG unlawfully resorted to:

- withholding the production of a USB storage device in violation of this Court's September 21, 2006 Order requiring production;

- withholding the critical hard drive from the laptop of Carlos Brown, president and owner of ACG, in violation of this Court's September 21, 2006 Order requiring production;

- reformatting and reloading an operating system onto two of ACG's hard drives well after the commencement of this case, which rendered files on those hard drives irretrievable; and

- destroying the ability to operate and examine an external storage drive by removing screws from the enclosure and end caps, removing a copper locking/grounding spring, removing the case fan, removing an anti-vibration pad, and then tampering with the hard drive while it was removed from its tray.

Despite ACG's efforts in erecting these obstacles, PML nonetheless caught ACG red-handed with the fraudulent coverage letter and fraudulent certificates of insurance on its computers. These documents were substantially identical to the fraudulent documents that PML received. Critically, these documents were saved in Word format, and the "fax header," which allegedly showed fax transmittal of these documents from Defendant RTP Insurance & Financial

Associates of Durham, Inc. ("RTP") to ACG, was nothing more than a Word header with typed-in "fax" information supplied by ACG.

Therefore, for the reasons discussed below, PML requests that this Court sanction ACG for its egregious conduct and enter a judgment by default against ACG pursuant to Fed. R. Civ. P. 37. Additionally, based on the evidence obtained through discovery, PML requests that this Court grant its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 as there is no genuine issue of material fact that ACG has committed fraud and breached its contract.

**STATEMENT OF RELEVANT FACTS**

**I.    FACTUAL BACKGROUND**

    **A.    PML Contracted with ACG to Obtain Workers' Compensation Insurance.**

PML is the majority owner of numerous professional employer organizations ("PEOs"). (First Amended Complaint ("Compl."), ¶ 7.) PML sought to obtain workers' compensation insurance for its PEOs and the customers of those PEOs.

PML was referred to ACG to obtain the necessary insurance for employees located in various states. (*Id.* at ¶ 9.) ACG offered its services to PML to obtain and provide workers' compensation insurance for PML because ACG represented that it had the ability to obtain a minority-owned business discount for insurance coverage and also had the ability to add additional insureds, such as PML and its PEOs, to its policy. (*See* **Exhibit A**, Responses to ACG's First Set of Interrogatories, p. 5.) ACG assured PML that it could obtain the workers' compensation insurance PML needed for its PEOs located in various states. (Compl., ¶ 10.) Based on these assurances, PML entered into the Contract with ACG on November 17, 2004, for ACG to obtain and provide workers' compensation insurance to PML. (**Exhibit B**, Agreement.)

2

**B.**    **ACG Delivered Certificates of Insurance and a Coverage Letter to PML in an Attempt to Satisfy PML's Repeated Requests for the Insurance Policy.**

PML requested that ACG provide the workers' compensation insurance policy on multiple occasions, and ACG informed PML that the policy would be arriving via mail. (*See* **Exhibit C**, PML Responses to ACG's Second Set of Interrogatories, pp. 7-8.) PML, however, never received the policy or the declaration of insurance page despite its repeated requests until after it initiated this action against The Hartford. (*Id.*)

In December 2004, rather than deliver the policy, ACG began to send certificates of insurance to PML, which demonstrated that PML had obtained insurance coverage for its PEOs and their customers. (**Exhibit D**, Certificates of Insurance.) The certificates listed RTP as the insurance broker and The Hartford as the insurer. Each certificate was signed by "Michael Carrow" of The Hartford. The fax transmittal footers on these documents also demonstrated that ACG sent the documents via fax to Michael Peterson of Worldwide Personnel Services of Virginia (fax number 540-667-1984), one of PML's PEOs. (*Id.*)

On December 8, 2004, PML's coverage was further confirmed in a letter from an account manager underwriter, "Michael Carrow," at The Hartford. (**Exhibit E**, 12/8/04 Coverage Letter.) PML received this letter from ACG when it was sent to PML's PEO, Worldwide Personnel. (*Id.*) The letter listed World Wide Alliance as an additional insured, and it stated:

> Note – Your request to provide coverage for additionally insured is approved, provided additionally insured meets deductible requirements for policy stated.
>
> Sincerely,
>
> Michael Carrow
> Account Manager Underwriter
> Direct Assignment Division
> Orlando Service Center

(*Id.*)  PML subsequently paid in excess of $38,000.00 in premiums to ACG for the Hartford policy.  (*See* **Exhibit F**, records of payments to ACG.)

### C.    PML Discovered That It Did Not Have the Required Workers' Compensation Insurance.

When PML began submitting workers' compensation claims to The Hartford, however, those claims were denied.  On February 2, 2005, PML filed a Complaint only against The Hartford. The Hartford advised PML that the certificates of workers' compensation insurance and coverage letter that ACG provided to PML were fraudulent, and that there was no one by the name of "Michael Carrow" who worked for The Hartford or St. Paul's Travelers, which serviced The Hartford's customers.  (*See* **Exhibit G**, Hutchins Affidavit.)  Indeed, there was an employee who worked for St. Paul's Travelers by the name of Michelle Hutchins, whose maiden name was Carrow.  (*Id.*)

PML also contacted ACG regarding The Hartford's denial of claims.  Mr. Bishop, counsel for ACG, advised PML that he had reviewed the policy, which was not provided to PML at the time, and that PML should enter into a new contract with ACG.  Mr. Bishop suggested to PML that is should assign its members' employees into ACG's staffing company, so that ACG could claim they were temporary staffing employees to obtain coverage.[1]    (**Exhibit C**, Responses to Second Set of Interrogatories, pp. 7-8; **Exhibit H**, 1/25/06 Letter & Response.)

PML then received a copy of its insurance policy from The Hartford for the first time. (**Exhibit I**, Policy.)  The policy did not meet the needs and requirements of PML, nor did it conform to the policy agreed upon pursuant to the Workers' Compensation Coverage Agreement

---

[1] PML obviously did not agree with this suggestion as it appeared to be a scheme to defraud The Hartford as well as the North Carolina Insurance Commission.

between ACG and PML. (**Exhibit B**, Agreement, pp. 3-4.) PML discovered, upon receipt of the policy, that the policy obtained by ACG was a small pool policy for ACG as a janitorial staffing company that only covered employees of ACG who were employed in North Carolina. (**Exhibit I**, Policy.) PML refused to agree to enter into a new contract and/or assign any employees to ACG. (*See* **Exhibit H**.)

On May 10, 2005, PML filed a First Amended Complaint in this action to include ACG and RTP as Defendants. After depositions of representatives of The Hartford were taken, and the documents allegedly sent by The Hartford were confirmed as fraudulent, PML dismissed The Hartford from this case without prejudice. Accordingly, the issue in this case involved whether ACG or RTP, or both, created the fraudulent documents and led PML to believe that it had workers' compensation insurance coverage. After conducting discovery relative to this issue, it is now abundantly clear that ACG was and is responsible for creating the fraudulent documents.

## II.     COMPUTER INSPECTION AND COURT'S ORDER

### A.     ACG Intentionally Withheld Computer Equipment from Production.

During this entire discovery process, ACG consistently has thrown up road blocks in order to prevent PML from uncovering damning evidence. On June 21, 2006, counsel for PML and PML's computer forensic expert, J. Stott Matthews, traveled to ACG's place of business in Durham, North Carolina to conduct the computer inspection and create mirror images of all data storage devices. ACG produced five hard drives for inspection and copying. (*See* **Exhibit J**, 8/18/06 Expert Report.)[2]

---

[2]  A color copy of each expert report has been provided to the Court with the filing of this Motion.

PML filed a Motion to Compel and to Expand the Relevant Timeframe for Inspection after the computer forensic examination of the above hard drives uncovered the fact that ACG used additional computer equipment, which it intentionally withheld from production. On September 21, 2006, after this Court held an evidentiary hearing on PML's Motion to Compel, the Court entered an Order Granting Plaintiff's Motion to Compel Production of Computer Equipment ("Order"). (**Exhibit K**, Order.)

**B.    ACG Violated This Court's Order by Failing to Produce Certain Computer Equipment.**

Pursuant to the Court's Order compelling the production of computer equipment, ACG produced a Belkin USB storage device, Mr. Brown's home laptop computer, and the hard drive allegedly used with ACG's back-up program.

**1. USB Storage Device**

The Belkin USB storage device, which was provided by ACG at the motion hearing, however, was not the device that this Court ordered ACG to produce pursuant to the Court's Order. (*See* **Exhibit L**, 9/29/06 Expert Report, p. 4.) PML requested the device identified as "Disk&Ven_Memorex&Prod_ThumbDrive&Rev_1.11." This device has not been produced, yet ACG used the missing USB storage device as recently as October 19, 2005. (**Exhibit J**, 8/18/06 Expert Report, p. 12.)

**2. Hard Drive Used with Brown's Laptop**

ACG also failed to produce the key hard drive identified as "40GB IBM Deskstar HD, model IC2N040ATCS04-0," which was used on Carlos Brown's laptop computer during the relevant time period in this case. The evidence demonstrated that this hard drive was used by

ACG during the November 2004 through April 2005 critical time period. (*See* **Exhibit J**, 8/18/06 Expert Report, p. 13; **Exhibit M**, Hearing Tr., pp. 28-29.)

C.    <u>ACG Willfully and Intentionally Destroyed Evidence.</u>

1.    **ACG Reformatted and Rewrote Hard Drives after Litigation Commenced, Thereby Rendering Files Irretrievable.**

The forensic computer examination of ACG's hard drives also confirmed ACG's willful destruction of evidence. Aside from its intentional failure to produce key computer equipment, ACG attempted to destroy evidence by reformatting critical hard drives. Specifically, ACG reformatted and cleared out the 9.1 GB Seagate Drive from ACG's front desk computer and 40GB Maxtor hard drive from the desktop computer of "Quinton." Mr. Matthews discovered:

> The 9.1 GB Seagate hard drive, model ST 39111A, from the front-desk area of ACG's office was reformatted on Sept. 8, 2005, as based on key file system dates. This reformatting occurred well beyond the date of the Complaint.
>                          * * *
> The 40GB Maxtor hard drive, model 6L040J2, from the desktop computer of "Quinton" was reformatted on July 21, 2005, as based on key file system dates. As with the "Front desk" computer drive, this reformatting occurred well beyond the date of the Complaint.

(**Exhibit L**, 9/29/06 Expert Report, p. 3.) As a result of this reformatting, Mr. Matthews concluded that ACG overwrote and destroyed key data:

> This **reformatting and reloading of the operating system over wrote key data** that could have been critical in understanding the role this computer played in the activities in the creation or handling of the fraudulent documents. [*Id.* (emphasis added).]

2.    **ACG Tampered with and Destroyed the External Storage Drive.**

ACG produced a hard drive that it allegedly used with a back-up system. The production of this hard drive, however, demonstrated two critical facts: (1) Mr. Brown of ACG perjured

himself on the stand during the evidentiary hearing on PML's Motion to Compel; and (2) ACG has engaged in the willful destruction of evidence.

During the evidentiary hearing, when questioned about the storage drive or server used with ACG's computers, Mr. Brown denied having knowledge of its existence:

> Q. . . . So it is your testimony you never instructed anybody to back up your system?
> A. No. We didn't have a back-up system, to my knowledge.
>                                      * * *
> Q. Do you know what that file path [\\storage\cbrown] is?
> A. No, sir.
> Q. Are you aware of any file path on your computer with that designation?
> A. No, sir. [

(**Exhibit M**, Hearing Tr., p. 79 – 80.) Mr. Brown, owner and president of ACG, testified that he had no knowledge of a back-up/storage hard drive or network used with his computers; yet, on October 1, 2006, Mr. Brown's own counsel located the "non-existent" storage drive. ACG's counsel e-mailed PML's counsel, stating, "I investigated and located ACG's missing back-up external hard drive yesterday, Saturday, afternoon." (**Exhibit N**, 10/1/06 E-mail.)

Screen shots of Mr. Brown's laptop and desktop computer hard drives also demonstrate that Mr. Brown had specific folders set up on his computers, which were identified as: "carlos on storage (Storage)," "cbrown on storage (Storage)," "operations on storage (Storage)," "Public on storage (Storage)," and "backup on insurance (Acg-3)." (**Exhibit L**, 9/29/06 Expert Report, pp. 5-6.) Indeed, metadata demonstrated that the storage/back-up folder entitled "backup on insurance" was used as recently as May 22, 2006 – one month prior to the computer inspection. (*Id.*) Therefore, Mr. Brown had full knowledge of the various back-up and storage drives, and he perjured himself on the stand before this Court.

PML's expert subsequently received the storage drive from ACG. Upon examination of the storage drive, however, there was evidence that ACG tampered with the drive. (**Exhibit O**, 10/6/06 Expert Report, p. 2 & photos.) Mr. Matthews observed:

> Upon opening the well packed device from its shipping box, the following observations were made:
> - Of two plastic end caps for the Maxtor enclosure, one was completely missing (Photo 2);
> - The end cap opposite the missing end cap was missing a screw and the screw that was present had a nearly stripped Phillips head machine screw (Photo 3);
>   a. The nearly stripped screw was under the partially missing "Warranty Void If Seal Broken" sticker (Photo 4);
>                              * * *
> - One of four of the copper locking/grounding springs was missing that is used in conjunction with a machine screw to attach the drive to the enclosure (Photo 6);
> - The two screws to hold the small case fan in place were missing (Photo available, but not included);
> - The foam/rubber anti-vibration pad between the drive and the enclosure was missing. Notice the square mark that remains on both the drive and the case (Photos 7 and 8 respectively).

(*Id.* at pp. 2-3.) As a result of these external problems with the hard drive, "**the drive failed to spin up or otherwise show any functionality**." (*Id.* at p. 2 (emphasis added).) Based on his observations, Mr. Matthews also concluded that the hard drive had been intentionally tampered with:

> - The Maxtor enclosure was opened with some apparent difficulty, based on the stripped screw, a missing screw, the missing end plate, and the stretched sheet metal of the end cap where a screwdriver or similar tool was used as leverage to slide the hard drive and electronics tray out.
> - The hard drive was removed from its tray, requiring the removal of four machine screws.

(*Id.*) Because of ACG's tampering with the storage drive, the drive was inoperable and no data could be retrieved from it. (*Id.*)

**D.**    **Critical Documents Were Located on ACG's Computers in Word Format.**

**1.  Fraudulent Certificates of Insurance**

On September 18, 2006, Mr. Brown testified under oath at the evidentiary hearing that he

did not retain any certificates of insurance on his computers in ACG's office:

> Q. Do you know whether the certs that were being searched for - - let me back
>    up.  You understand that this inquiry, **this entire hearing focuses around this**
>    **search for certificates of insurance?**
> A. Correct.
> Q. **Did you have those generate to those or maintained those on your**
>    **computer system at ACG's office in Durham?**
> A. **No.**

**(Exhibit M,** Hearing Tr., p. 82 (emphasis added).)

Not only were certificates of insurance located on Mr. Brown's computers, demonstrating

that he has again perjured himself, but certificates were located that were identical in format to

the subject fraudulent certificates.    **(Exhibit J,** 9/29/06 Expert Report, pp. 12-14.)    The

certificates also were in Word format.[3]

Moreover, the forensic examination of RTP's computers uncovered evidence that RTP

does not use the 1998 ACCORD form.  Of all the certificates of insurance found during the

examination, not one was the 1998 form.  **(Exhibit P,** 8/18/06 Expert Report on RTP's Hard

Drives, p. 7.)  A typical sample of a certificate of insurance used by RTP is attached at **Exhibit**

**Q.**    As demonstrated by RTP's Motion for Summary Judgment, RTP agrees with PML's

analysis of the facts in this Brief.

---

[3] A disk containing the fraudulent documents, which are discussed in this Brief, has been
provided to the Court concurrently with the filing of this Motion.  Each document has been
copied to this disk by Mr. Matthews in the same format in which he found it on ACG's
computers.  It is critically important to note the ease with which a party, here ACG, is able to
type in a fake fax header and data into these Word documents.  Indeed, the disk demonstrates
that the RTP fax line on the coverage letter is a Word header.

Conversely, the certificates of insurance on ACG's computers used the 1998 ACCORD form. A review of the certificate found on ACG's computers, attached as **Exhibit R**, in comparison to the fraudulent certificates of insurance that ACG sent PML, attached as **Exhibit D**, also demonstrates the substantial similarity in the fonts used, the formatting, and the footers used (e.g., "Copy of ACG Enterprises.max").

### 2. Fraudulent Insurance Coverage Letter

PML located the fraudulent coverage letter on Mr. Brown's hard drive as a Word document. (*See* **Exhibit S**, Coverage Letter found on ACG's computers; **Exhibit J**, pp. 14-15.) The fax transmittal "header" again was merely a Word header in which ACG could type in a date, time, and fax number to falsely claim that the document was faxed by Hartford or RTP.

There was an additional letter located on ACG's computers. The letter was in Word format and had a "fax" header from The Hartford. The letter allegedly confirmed coverage for PML for all of its PEOs and their customers in all fifty states: (**Exhibit T**, 12/28/04 Draft Letter); **Exhibit J**, p. 25.) PML never received this letter from ACG.

### 3. "How to Produce a Certificate of Insurance"

As further evidence of ACG's fraudulent activity, Mr. Brown presented inconsistent testimony to this Court when attempting to explain why he had a document on his computers entitled "How to Produce a Certificate of Insurance." Mr. Brown responded to this Court's questioning as follows:

> Q. THE COURT: Mr. Brown, what do you mean you looked it up, this cert, how to produce a certificate of insurance? You looked it up to see if you could do it?
> A. No, We looked it up to see, basically, how we needed to send them through. We called the insurance company.
> Q. Where did you look it up?
> A. On the internet.
> Q. An how did this document get on your computer then?

    A. Accord Forms.  The insurance company tells you that they'll show you what a certificate looks like, what is fraudulent and what is real.  That's why we made sure all certificates went through our agent.

    Q. Which insurance company did you look – there are lots of insurance companies. Which one did you look for this document?

    A. Accord.

    Q. Accord. That's an insurance company?

    A. Well, that's actually who makes the certificates.  That's who generates them.

    Q. Accord?

    A. Yes, sir.

    Q. And so this document either is or was on their website?

    A. Yes.

    Q. This document called, "how to produce a certificate of insurance"?

    A. To my knowledge, yes, sir.

    Q. So the reference to Charlie's computer is their language?

    A. No, sir.  This is ours.

**(Exhibit M**, Hearing Tr., pp. 84-85.)  This testimony also demonstrates that ACG had the

knowledge and the capability to download a certificate of insurance form from the ACCORD

website and use it to fraudulently create the subject certificates of insurance.

       The "How to Produce a Certificate of Insurance" document constitutes a written plan of

ACG's fraudulent scheme.  The document provides instructions for ACG to create a fraudulent

certificate of insurance.  For example, the document instructs an ACG employee how to create a

fake "fax line."  **(Exhibit U.)**  The document states:

1. Go to Charlie's Computer
2. Click on "Insurance Certs" Folder on his desktop
3. Click on "CRS Client" Folder
4. Click on "AAA-CSR Blank" (I know, it's supposed to be CRS)
5. Change Date/Time:
    a. Click on the text box that has the "fax line" date.
    b. Change Time, also (be sure to make it "PM or AM."  Include "seconds")
6. Change "Page number":
    a. If making more than one cert, be sure NOT to duplicate page numbers
    b. Always assume a "coversheet" is included, so your cert will NEVER be "Page 1 of 1"
7. Change Date of Cert:
    a. Click on 'Cert holder' text box
    b. Add "cert holder" information provided by CRS, including FAX number but NOT contact names

* * *

12. Print this cert
13. Place on Michael's desk for his signature
14. Once "signed" by Michael, fax to CRS
15. . . .

Send RTP a cert request!

(*Id.*) The metadata for this document states that it was created by Charles Thomke, employee of

ACG, and last saved by Carlos Brown on February 18, 2005. (**Exhibit J**, 8/18/06 Expert Report,

p. 18.) As discussed above, there is no "Michael Carrow" at The Hartford, but apparently, there

is a "Michael" at ACG who is signing certificates.

## ARGUMENT

**I.    THIS COURT SHOULD ENTER A JUDGMENT BY DEFAULT AGAINST ACG
AS SANCTIONS PURSUANT TO FED. R. CIV. P. 37 FOR ACG'S VIOLATION
OF THIS COURT'S ORDER AND WILLFUL DESTRUCTION OF EVIDENCE.**

ACG's violation of this Court's Order through its failure to produce the critical hard drive

and USB storage device, in addition to ACG's destruction of evidence on three hard drives

through reformatting, its tampering with the drives, and the perjury committed by Carlos Brown,

support PML's request for a judgment by default against ACG.

Fed. R. Civ. P. 37 states in pertinent part:

(2)  Sanctions by Court in Which Action Is Pending.  If a party or an officer, director, or
managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify
on behalf of a party fails to obey an order to provide or permit discovery, including an
order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an
order entered under Rule 26(f), the court in which the action is pending may make such
orders in regard to the failure as are just, and among others the following:
* * *
(C)  An order striking out pleadings or parts thereof, or staying further proceedings until
the order is obeyed, or dismissing the action or proceeding or any part thereof, or
rendering a judgment by default against the disobedient party.

13

Fed. R. Civ. P. 37(b)(2)(C). This Rule permits a court to make "such orders . . . as are just with regard to a party's failure to obey an order to provide or permit discovery, including an order made under Rule 37(a), Motion for Order Compelling Discovery." *Regional Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 153 (6th Cir. 1988). Dismissal of an action, or its corollary of judgment by default, is proper where there is a showing of willfulness, bad faith, or fault on the part of the party failing to cooperate in discovery. *Id.* at 153-54. For this reason, the Sixth Circuit in *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067 (6th Cir. 1990), affirmed the trial court's entry of a default judgment against defendants as sanctions for noncompliance with a discovery order. The Court concluded that "the defendants' lack of response to the court's order to compel discovery . . . demonstrated the futility of any lesser sanctions." *Id.* at 1069.

In addition to issuing default judgments for violation of discovery orders, courts have the discretion to issue default judgments for spoliation of evidence. Michigan courts consistently have held that "even when an action has not been commenced and there is only a potential for litigation, the litigant is under a duty to preserve evidence that it knows or reasonably should know is relevant to the action." *Brenner v. Kolk*, 226 Mich. App. 149, 573 N.W.2d 65, 71 (2002). "The authority to sanction litigants for spoliation arises jointly under the Federal Rules of Civil Procedure and the court's inherent powers." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) ("*Zubulake V*"). The use of dismissal, or default judgment, as a sanction for failing to comply with discovery accomplishes the dual purpose of punishing the offending party and deterring similar litigants from such misconduct in the future. *Id.* (citing *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976)).

Although Eastern District of Michigan courts have stated that "default should be used only in flagrant cases," they have also recognized that "[t]he policy of resolving lawsuits on their merits must yield when a party has intentionally prevented the fair adjudication of the case by destroying documents." *Helmac Prod.'s Corp. v. Roth (Plastics) Corp.*, 814 F. Supp. 560, 571 (E.D. Mich. 1992) (citations omitted) (entering a default against a defendant that intentionally destroyed relevant documents.).   The *Helmac* court examined the following factors before entering a default against the defendant:

      (1) that Defendant acted willfully or in bad faith;
      (2) that Plaintiff was prejudiced by Defendant's conduct; and
      (3) that lesser sanctions would not serve the punishment-and-deterrence goals set
          forth in *National Hockey League* and its progeny.

*Id.* at 572 (citing *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107 (S.D. Fla. 1987)).

The case, *Kucala Enters., Ltd. v. Auto Wax Co., Inc.*, 2003 U.S. Dist. LEXIS 8833 (N.D. Ill. 2003), attached hereto as **Exhibit V**, is closely analogous to the facts of the case at bar.   In that case, the court ordered that the plaintiff allow inspection of his desktop computer for relevant files.   However, the defendant's computer forensic expert discovered that the plaintiff had installed software to destroy evidence. *Id.* at *5.   The expert also discovered that more than 15,000 files had been deleted and overwritten in the three days prior to the inspection. *Id.*   The evidence also demonstrated that the plaintiff had failed to produce another computer and threw away another computer. *Id.* at *8-9.   The court held that the plaintiff's actions were unreasonable, grossly negligent, and in flagrant disregard of court order. *Id.* at *22-23.

The *Kucala* court noted that it "may never find out what files were deleted.   The possible prejudice to [the defendant] is enormous, or perhaps inconsequential.   The plaintiff's actions have all but prevented adequate discovery in this case, and severely limited the fact finder's

ability to do its job." *Id.* at \*23. Because allowing the plaintiff to proceed with his case "would

benefit him and would result in a slippery slope of future egregious behavior by litigants," the

court held that the appropriate sanction was to dismiss his suit with prejudice and order him to

pay the attorney's fees and costs incurred by the defendant from the time that the plaintiff began

destroying evidence his computer. *Id.* at \*24-25.[4]

Similar to the plaintiff in *Kucala*, ACG has intentionally and willfully destroyed evidence

as follows:

- ACG has refused to produce the critical hard drive used on Mr. Brown's laptop and the USB storage device in clear violation of this Court's Order. (*See* **Exhibit K**.)

- ACG reformatted and reinstalled the operating system on the hard drive used with the front desk computer and on another hard drive used on a desktop computer. As a result, the files cannot be retrieved. The reformatting and spoliation occurred in July and September of 2005 – after ACG became a party to this action in May 2005. (*See* **Exhibit L**, 9/29/06 Expert Report.)

- ACG blatantly tampered with the external storage drive to ensure that it was inoperable. Metadata shows that this storage drive was used as recently as May 2006 – one month before the computer inspection. ACG, however, did not produce this drive at the inspection and finally produced it in response to the Court's Order in October 2006. (*See* **Exhibit O**, 10/6/06 Expert Report.)

Not only did ACG violate this Court's Order and its duty to preserve evidence, but ACG also

violated the December 14, 2005 Preservation Order when it destroyed the operability of the

external storage drive between the time period of May 2006 and October 2006.

---

[4] Courts in jurisdictions throughout the country have entered a default or dismissal in cases involving the destruction of evidence. *See, e.g., Telectron, supra* (holding that default judgment was the only appropriate sanction for destroying documents, which resulted in prejudice to the plaintiff); *Wm. T. Thompson Co. v. Gen. Nutrition Corp., Inc.*, 593 F. Supp. 1443 (C.D. Cal. 1984) (entering default judgment against a defendant for destroying documents and erasing computer tapes and discs); *Computer Assoc. Int'l, Inc. v. Am. Fundware, Inc.*, 133 F.R.D. 166 (D. Colo. 1990) (holding that default judgment was the only appropriate remedy against a defendant who destroyed all copies of its source code despite a duty to preserve this evidence).

ACG's egregious conduct has all but prevented adequate discovery in this case and has needlessly increased the cost of litigation for PML. Because allowing ACG to proceed with its defense in this case would "result in a slippery slope of future egregious behavior by litigants," this Court should enter a judgment by default against ACG. *Kucala,* 2003 U.S. Dist. LEXIS 8833 at **24-25. Any lesser sanction under these circumstances would be futile.

## II.    THIS COURT SHOULD GRANT PML SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56.

Despite ACG's extensive efforts to hide and destroy key evidence, PML was able to locate the fraudulent certificates of insurance and the coverage letter in Word format on ACG's computers. Therefore, this Court, independent of the relief requested for ACG's discovery abuse, should grant PML summary judgment pursuant to Fed. R. Civ. P. 56.

### A.    <u>Standard of Review under Federal Rule of Civil Procedure 56</u>

PML brings this Motion pursuant to Fed. R. Civ. P. 56. A motion for summary judgment under Rule 56 should be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party opposing a motion for summary judgment must affirmatively demonstrate that there is a disputed issue of fact which is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248; 106 S. Ct. 2505 (1986). A material fact is one "which might affect the outcome of the suit under the governing law." *Id.*

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action . . . ." *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 327 (1986).  Because no set of facts can save ACG from being caught red-handed with the fraudulent documents, this Court should grant PML summary judgment.

**B.    There Is No Genuine Issue of Material Fact That ACG Created the Fraudulent Documents.**

There is no genuine issue of material fact that ACG created the fraudulent documents at issue in this case and breached the Workers Compensation Coverage Agreement.  Not only did the computer examination uncover explicit instruction for ACG employees to create fraudulent certificates of insurance, it also uncovered the fraudulent document allegedly faxed by The Hartford and RTP as a Word document with the "fax lines" typed in by ACG.

To prove actionable fraud, fraudulent misrepresentation or inducement, a plaintiff must show the following:

> (1) that the defendant made a material representation; (2) that it was false; (3) that when he made it he knew it was false, or that he made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that the plaintiff should act on it; (5) that the plaintiff acted in reliance upon it; and (6) that the plaintiff thereby suffered injury.

*Kuebler v. Equitable Life Assur. Soc'y of the United States*, 219 Mich. App. 1, 6; 555 N.W.2d 496 (1996).

This case presents the quintessential example of fraud and fraudulent inducement.  ACG represented to PML that it could obtain workers' compensation insurance for PML, its PEOs, and their customers throughout the United States.  Consequently, PML contracted with ACG for insurance coverage and paid ACG in excess of $38,000 in premiums until PML determined that there was no coverage.

In order to cover its tracks when PML began requesting the insurance policy, ACG fraudulently created the certificates of insurance which falsely stated that PML had coverage for

its members outside of North Carolina. ACG followed the same process to create these certificates that is exemplified in the document "How to Produce a Certificate of Insurance" (i.e., ACG ensured that its "fax line" was properly falsified to show a fake transmission from The Harford or RTP and that it obtained the "signature" of "Michael," the non-existent Hartford employee before faxing the certificate). (*See* **Exhibit U.**) After the certificate was faxed to PML, ACG would follow-up with a certificate request to RTP to cover its tracks. (*Id.*) ACG also typed up and sent PML the fraudulent insurance coverage letter from "Michael" at The Hartford to further corroborate its scheme of fraud. (**Exhibit E**, 12/8/04 Coverage Letter.)

Before ACG could steal more money from PML, however, a worker suffered a closed-head injury in December 2004, with the claim first coming to PML's attention in January 2005. PML thereafter discovered that it did not have a workers' compensation insurance policy in place with The Hartford that would cover the injured worker, or any other worker outside of the state of North Carolina.[5]

The forensic examination of ACG's computers caught ACG red-handed. The certificates of insurance located on ACG's computers are identical to the certificates of insurance that were allegedly sent from The Hartford to ACG for PML: The certificates had the same font, wording, and format of the 1998 ACCORD form. (*See* **Exhibit D & R.**) The certificates on ACG's computers were in a format that allowed ACG to manipulate the header and footer to create fake fax lines. These documents clearly are dispositive on the issue of ACG's fraudulent conduct.

Moreover, in addition to ACG's fraud and fraudulent inducement, ACG clearly breached the Workers' Compensation Coverage Agreement. (**Exhibit B,** Agreement.) To establish a

---

[5]    Although damages are not dealt with in this Motion, this claim, as well as other claims that have been filed, constitutes hundreds of thousands of dollars of potential exposure to PML.

breach of contract claim, the plaintiff must show that there was a valid contract. The requisite elements of a valid contract are (1) parties competent to enter into a contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Thomas v. Leja*, 187 Mich. App. 418, 422; 468 N.W.2d 58 (1991). The Agreement required that "ACG will maintain workers' compensation coverage for each PML Employee in accordance with the laws of the states in which ACG provides under this Agreement." (**Exhibit B**.) ACG clearly did not obtain and maintain the required insurance coverage for PML.

Because there is no genuine issue of material fact that ACG fraudulently induced PML to enter into the contract and then breached the contract by failing to provide PML and its PEOs with workers compensation insurance coverage, PML requests summary judgment on its breach of contract and fraud claims.

## CONCLUSION

For the foregoing reasons, PML respectfully requests that this Court grant its Motion for Judgment by Default and Summary Judgment, and award PML its costs and attorneys' fees for having to file this Motion.

Respectfully submitted,

BUTZEL LONG

/s/_____Katherine D. Goudie_____
Michael G. Latiff (P51263)
Katherine Donohue Goudie (P62806)
150 West Jefferson, Suite 100
Detroit, MI 48226-4450
(313) 225-7000
E-mail: latiff@butzel.com
         goudie@butzel.com

Dated:   October 20, 2006                    Attorneys for Plaintiff
/877124/

20

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2006, I electronically filed **PLAINTIFF'S MOTION FOR JUDGMENT BY DEFAULT AND MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT** with the Clerk of the Court using the ECF system which will send notification of such filing to registered counsel.

I further certify that on October 20, 2006, I caused a copy of the foregoing paper and all attachments thereto to be served on each of the following via first class U.S. Mail:

Keith Bishop, Esq.                          John Edward Gilchrist, pro se
Madison Center, Suite 105                   3325 Chapel Hill Blvd., Suite 145
1802 Martin Luther king, Jr. Parkway        Durham, NC 27707
Durham, North Carolina 27707

Mark A. Haywood, Esq.
Mark A. Haywood & Associates, PLC
1274 Library St., Suite 604
Detroit, MI 48226

by placing same in a sealed envelope, addressed to said attorney and depositing same in the United States mail in Detroit, Michigan, with postage fully prepaid.

I declare that the foregoing is true and accurate to the best of my information, knowledge and belief.

                              BUTZEL LONG

                              /s/ Katherine D. Goudie
                              Michael G. Latiff (P51263)
                              Katherine Donohue Goudie (P62806)
                              150 West Jefferson, Suite 100
                              Detroit, MI 48226-4450
                              (313) 225-7000
                              E-mail: latiff@butzel.com
                                      goudie@butzel.com
                              Attorneys for Plaintiff