## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PML NORTH AMERICA, LLC,

        Plaintiff,

v.                              Case No. 05-CV-70404-DT

HARTFORD UNDERWRITERS INSURANCE
COMPANY, ACG ENTERPRISES OF NC, INC.,
and JOHN E. GILCHRIST d/b/a RTP
INSURANCE & FINANCIAL ASSOCIATES OF
DURHAM, NC,

        Defendants.

_____/

### OPINION AND ORDER GRANTING PLAINTIFF'S "MOTION FOR JUDGMENT BY DEFAULT AND PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT ACG ENTERPRISES OF NC, INC."

This case revolves around discovering who was responsible for the production of demonstrably false certificates of workers' compensation insurance that were provided to Plaintiff PML. Such evidence as has been uncovered points to Defendant ACG, which, the evidence also shows, is responsible for the destruction or loss of other critical evidence. In this Opinion and Order, judgment is accordingly granted to Plaintiff PML.

On October 20, 2006, Plaintiff, PML North America, LLC ("PML") filed its "Motion for Judgment by Default and Summary Judgment Against Defendant ACG Enterprises of NC, Inc" ("ACG"). Co-defendant John Gilchrist, doing business as RTP Insurance & Financial Associates of Durham, NC ("RTP"),[1] filed an earlier motion for summary judgment against PML on September 11, 2006. PML initially opposed Gilchrist's motion, but, in light of later

---

[1]The court will refer to this Defendant as Gilchrist.

discovery and its pending motion against ACG, the court requested a supplemental brief from PML regarding its claims against Gilchrist.  (12/5/06 Order.)  PML responded that with respect to Gilchrist there was no issue of material fact.  (12/11/06 Pl.'s Supp. Brief at 1.)  Therefore, the court granted Gilchrist's motion for summary judgment.  (12/12/06 Order.)  For the remaining and pending motion by PML against ACG, the court heard argument at a hearing on December 14, 2006.

## I.  FACTUAL BACKGROUND

PML is a Michigan limited liability corporation that is a majority owner of several professional employer organizations (PEOs).  (Am. Compl. at ¶¶ 1, 7.)  PML sought to obtain worker's compensation insurance for their PEOs and contracted with Defendant ACG of North Carolina for that purpose.  (*Id.* at ¶¶ 9-11.)  According to the their contract, ACG agreed to "maintain workers' compensation coverage for each PML Employee in accordance with the laws of the states in which ACG provides services under this Agreement."  (11/17/04 Workers Compensation Coverage Agreement[2] at 3, Pl.'s Ex. B.)  According to paragraph 9A of the Agreement, "ACG represents that it is a legal entity authorized to conduct business in the state wherein the services of this agreement will be performed."  (*Id.* at 6.)  PML alleges that ACG obtained through Defendant RTP,[3] ACG's insurance from Defendant Hartford.[4]  (Am. Compl. at ¶ 12.)

---

[2]The court will refer to this document as "the Agreement."

[3]RTP is a sole proprietorship owned by Mr. John Gilchrist, who appeared *pro se* on behalf of RTP.  (10/18/05 Order.)  The court considers Gilchrist and RTP one and the same.

[4]By stipulation, Plaintiff's claims against Hartford were dismissed.  (11/9/05 Stipulation and Order.)

PML claims that, despite repeated requests, ACG did not deliver to PML the insurance policy until after the instant litigation began. (PML Responses to ACG's Second Set of Interrogatories at 7-8, Pl.'s Ex. C.) Beginning in December 2004, ACG instead started to send certificates of insurance to PML that listed RTP as the broker and Hartford as the insurer. (Certificates of Insurance, Pl.'s Ex. D.) One "Michael Carrow" of Hartford signed each certificate. (*Id.*) On December 8, 2004, the same "Michael Carrow" sent a letter purportedly on behalf of Hartford stating that the insurance for ACG and one of PML's PEOs was effective. (12/8/04 Coverage Letter, Pl.'s Ex. E; Pl.'s Br. at 3.) PML then paid ACG over $38,000 in premiums for the Hartford policy. (Financial Records, Pl.'s Ex. F.)

Problems arose when Hartford began denying PML's claims for workers' compensation. (Am. Compl. at ¶¶ 14-16.) Hartford informed PML that the coverage letter and insurance certificates provided by ACG were fraudulent, as there was no Michael Carrow who worked for Hartford. According to an unrebutted affidavit by Hartford employee Michelle Hutchins, whose maiden name is Carrow, she was no longer known as Michelle Carrow as of November 2004 and is not the author of the letter. (6/10/05 Hutchins Aff. at ¶¶ 2, 7.) She further avers that the letterhead and formatting of the letter do no match letters originating from Hartford. (*Id.* at ¶ 7.)

PML contacted ACG about the denial of its claims and ACG's counsel proposed modification of the Agreement to obtain insurance coverage for employees outside of North Carolina by reclassifying PML's employees outside of North Carolina as temporary staffing employees of ACG. (1/21/05 Letter, Pl.'s Ex. H.) PML, which still had not received a copy of its policy, rejected the proposal and threatened legal action for fraud. (1/25/05 Letter,

3

Pl.'s Ex. H; Pl.'s Br. at 4.)  PML describes ACG's proposal as "a scheme to defraud The Hartford as well as the North Carolina Insurance Commission."  (Pl.'s Br. at 4 n.1.)

When PML did receive its policy from ACG, the policy, in the opinion of PML, did not meet the requirements of the Agreement because it "was a small pool policy for ACG as a janitorial staffing company that only covered employees of ACG who were employed in North Carolina."  (Pl.'s Br. at 4-5; Insurance Policy, Pl.'s Ex. I.)

## II. PROCEDURAL BACKGROUND

PML filed its amended complaint on May 10, 2005.  The complaint asserts against ACG and RTP counts of unjust enrichment, promissory estoppel, fraud and misrepresentation, conspiracy, as well as, solely against ACG, counts of breach of contract and conversion.  (Pl.'s Am. Compl. at 6-12.)  The origin of the fraudulent letter and certificates of insurance is the key factual question of the complaint.   The parties commenced discovery, which led to a number of discovery disputes between PML and ACG.

The court issued an order setting the protocol for electronic discovery of information stored on several of Defendants' hard drives.  (7/14/06 Order.)  Pursuant to that order, Plaintiff filed a motion to compel against ACG, alleging noncompliance.  (8/30/06 Pl.'s Mot. to Compel.)  On September 19, 2006, the court held a hearing to hear testimony from J. Stott Matthews, Plaintiff's forensic expert, and from Carlos Brown, ACG's chief executive officer, in order to gain a fuller understanding of the technical aspects of the discovery dispute.  (9/21/06 Order at 1.)  The court granted Plaintiff's motion to compel and ordered production of a specifically identified hard drive (an essentially permanent means of data storage designed to be either internal to the computer or externally housed in its own case),

4

a "thumb-drive" (a small, removable data storage device), backup target disks, and Brown's home laptop computer.  (*Id.* at 1-2.)  The court also extended the scope of the time period under the original discovery protocol for search of discoverable files.  (*Id.* at 1.)

Plaintiff's instant motion describes several violations of the court's most recent discovery order by ACG, which will be detailed below.  (Pl.'s Br. at 5-10.)  Plaintiff requests that a judgment by default against ACG is the appropriate sanction under Federal Rule of Civil Procedure 37.  (*Id.* at 13-17.)  Gilchrist concurs in the motion and argues that RTP should therefore be exonerated by implication.  (10/26/06 Gilchrist's Br. at 2.)[5]  Plaintiff further argues that, even if dismissal for the alleged discovery violations is inappropriate, summary judgment under Rule 56 is appropriate because discovery revealed a number of fraudulent documents stored on ACG's computers.  (Pl.'s Br. at 17-20.)

In response, ACG contends that it did not act in bad faith and suggests "that if the court finds that relevant evidence was destroyed by ACG's incompetent management of its equipment, a trial instruction on spoliation would [be] an appropriate remedy" and not "default in a claim for millions of dollars."  (ACG's Br. at 7.)[6]  ACG further contends that the alleged discovery violations are irrelevant to the dispositive issues for a number of reasons detailed below, including the contention that the Agreement is void under North Carolina

---

[5]Because Gilchrist's pleading lacks page numbers (and, incidentally, is improperly single-spaced throughout), the court will refer to the page numbers generated by its electronic filing system.

[6]The court notes that ACG's brief, which was filed late, was also filed piecemeal with resulting sections of non-consecutive page numbers generated by the court's electronic filing system.  The court will therefore refer to the consecutive page numbers generated by ACG, even though ACG's numbering at the end of the document inexplicably jumps from 24 to 27.

5

law and therefore unenforceable in the first place.  (*Id.* at 17-22.)

### III.  DISCUSSION

### A.  Motion for Judgment by Default under Federal Rule of Civil Procedure 37

### 1.  Standard

"If a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may [enter] . . . [a]n order . . . dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party[.]" Fed. R. Civ. P. 37(b)(2).   Because a party fails to obey a discovery order merely by failing to comply, no showing of willfulness, bad faith, or malice is needed.  *Societe Internationale Pout Participations Industrialles er Commericiales, S.A. v. Rogers*, 357 U.S. 197, 208 (1958).

Whether the noncompliance with the order was willful or in bad faith bears only on the appropriate sanction.  *Id.*  "Rule 37 should not be construed to authorize dismissal of [a] complaint . . . when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault. . . ."  *Id.* at 212.  Conversely, "if a party has the ability to comply with a discovery order and does not, dismissal . . . is not an abuse of discretion."  *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990) (quotation, citation omitted).

Although it is within the sound exercise of a court's discretion, it is also true that default is a powerful sanction best reserved for "flagrant" cases.  *Helmac Products Corp. v. Roth (Plastics) Corp.*, 814 F. Supp 560, 571 (E.D. Mich. 1992) (quotation, citation omitted).  Relevant considerations include (1) the wilfulness of the

6

noncompliance, (2) the prejudice to the moving party and to the presentation of the case, (3) the adequacy of less severe sanctions for redressing the wrongdoing and (4) deterrence of other potential abusers of the discovery process. *Id.* (citations omitted).

### 2. Judgment by Default Against ACG Is an Appropriate Sanction

The record supports Plaintiff's contention that throughout the discovery process ACG has obstructed PML's attempts to uncover damaging evidence against ACG. On June 21, 2006, Matthews, PML's forensic expert, traveled to North Carolina to inspect and copy five hard drives that ACG produced. (8/18/06 Expert Report, Pl.'s Ex. J.) Matthews's review of these hard drives and his helpful testimony at a subsequent evidentiary hearing persuaded the court that ACG withheld additional computer equipment that, as a result, the court ordered ACG to produce. (9/21/06 Order.)

While ACG produced some additional equipment, it did not match the equipment identified in the court's order. The thumb drive provided is not the one identified, even though ACG used the identified thumb drive as late October 2005, several months after PML filed suit against ACG in May 2005. (9/29/06 Expert Report at 4, Pl.'s Ex. L.) ACG admits that it has not produced the identified thumb drive, but disavows possession, control or knowledge of its whereabouts, and denies destroying it. (ACG's Br. at ¶19.) ACG also failed to locate the forty gigabyte hard drive (IBM Deskstar HD, model IC2N040ATCS04-0) used on Brown's laptop during the relevant time period in this case that the court ordered produced, as there is no mention of this drive in Matthews's September 29, 2006 report, (Pl.'s Ex. L), and PML contends that ACG failed to produce the hard drive, (Pl.'s Br. at ¶20), which ACG denies without explanation, (ACG's Br. at

7

¶20.).

Furthermore, there is evidence of data spoliation and physical tampering with computer hardware.  The hard drive from ACG's front desk computer, which is named "Quinton," was reformatted on July 21, 2005, after the date of the complaint.  (*Id.* at 3.) Matthews concluded that the "reformatting and reloading of the operating system over wrote key data that could have been critical in understanding the role this computer played in the activities in the creation or handling of the fraudulent documents."  (*Id.*)

Matthews also inspected an external hard drive device that bears telltale physical signs of tampering.  Matthews describes these signs in his October 6, 2006 report, which includes detailed photographs that match his descriptions.  (10/6/06 Expert Report, Pl.'s Ex. O.)  The evidence includes the following:

(1) a missing plastic end cap for the drive's enclosure
(2) another end cap with a missing screw and a nearly stripped screw
(3) a missing copper locking/grounding spring
(4) two missing screws that hold the small case fan in place[7]
(5) a missing foam/rubber anti-vibration pad that is apparent in the adhesive-like mark left on the remaining hardware
(6) stretched sheet metal of the end cap, suggesting a screwdriver or a similar tool was used as leverage to slide out the hard drive and electronics tray       (*Id.*

at 2.)  When Matthews connected the drive and attempted to use it, "the drive failed to spin up or otherwise show any functionality.  (*Id.*)  Consequently, "no analysis could be conducted upon it."  (*Id.*)

Finally, PML contends that discovery of backup or storage drives and folders,

---

[7]This item lacks a corresponding photograph, but Matthews states that one is available.  (10/6/06 Expert Report at 2, Pl's Ex. O.)

(10/1/06 E-mail, Pl.'s Ex. N; 9/29/06 Expert Report at 5-6, Pl.'s Ex. L), the existence of

which Brown denied at the hearing (9/18/06 Tr. at 79-80, Pl.'s Ex. M), proves that Brown

perjured himself (Pl.'s Br. at 8.).  Matthews's report found metadata (data associated

with but not normally visible in a document) indicating that at least one back-up folder

was accessed as recently as May 22, 2006, well after the filing of the complaint and

about a month before the first computer inspection.  (9/29/06 Expert Report, Pl.'s Ex. L.)

The great weight of the above evidence finds only slight counterbalance in ACG's

response.  ACG gives blanket denials without presenting sworn affidavits or citing to

record evidence.  ACG claims that it did not act in bad faith and argues for a "benign

view . . . that ACG failed to recognize its duties to safe guard its equipment when

confronted with predictable system failure."  (ACG's Resp. at 7.)  Elsewhere, ACG offers

an implicit suggestion of "evidence destruction result[ing] from poor administrative

control by ACG over its staff and service technicians."  (*Id.* at 20.)  Most telling, ACG

attempts to skirt the issue by calling the discovery allegations irrelevant to the

dispositive issues.  (*Id.* at 6-8, 20, 22.)[8]

The court disagrees.  The discovery violations are in and of themselves

dispositive.  Based upon the evidence presented, the court finds that ACG's failure to

meet its court-ordered discovery obligations is willful and intentional.  Indeed, the court

finds it difficult to imagine a reasonable jurist who would find otherwise.  The detailed

---

[8]The court appreciates the candor of ACG's counsel at the hearing, where, in reference to the above discovery violations, he said, "it looks bad."  As limited as ACG's counsel is by ACG's inability or unwillingness to hire its own forensic expert, the court does not accept the wholly speculative surmise by ACG's counsel that further forensic examination of the inoperable and reformatted drives might reveal no inculpatory data. That surmise, in any event, does not address the missing hardware.

reports of Matthews demonstrate with specificity a pattern on the part of ACG of evasiveness, obfuscation and tampering with important evidence.  The inoperable external hard drive is perhaps most damning.  Innocent neglect does not cause stripped screws, bent sheet metal, missing parts and other evidence of deliberate tampering and destruction.  The court does not accept ACG's clumsy attempt to appear ignorant and therefore less culpable.  Even if the court did adopt a more benign view, as ACG pleads, there is a point beyond which bumbling and blindness to a party's discovery obligations sufficiently resemble the sort of willful, intentional and malicious conduct that calls for the heavy sanction of judgment by default.  *See e.g. National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976) (holding that dismissal or default judgment as a sanction for discovery violations serves the dual purpose of punishing the offending party and deterring future litigants from similar misconduct).

ACG's noncompliance has imposed significant burdens upon the other parties and upon this court.  The quantity of legal briefing and the cost of forensic expert assistance expended is no small matter.  An evidentiary hearing, which consumed substantial private and public resources, was necessary for the court to properly evaluate these apparently unnecessary expenditures.  Gilchrist, meanwhile, was left to twist in the wind as PML and ACG litigated their discovery disputes.  The prejudice is not limited to the cost of litigation and the delay that ACG caused.  More importantly, the loss of potentially relevant discoverable information is great.  The lack of available discovery is total for the damaged drive that is inoperable, the unlocated drives and the reformatted drive.  The situation is striking given the general duty of litigants to avoid spoliation of evidence from the moment that a party knows or should reasonably know

10

that there is a potential for litigation. *See e.g., Brenner v. Kolk*, 573 N.W.2d 65, 71

(Mich.Ct.App. 2002). In this case, ACG was on notice of the potential of litigation as

early as its receipt of the January 25, 2005 letter in which PML rejected any modification

to the Agreement and informed ACG to expect communication from PML's attorneys.

(1/25/05 Letter, Pl.'s Ex. H.)

The court is convinced that a lesser sanction would be inadequate. In light of the

willfulness of ACG's misconduct and the prejudice it has caused, especially in terms of

total loss of otherwise discoverable material, the court cannot allow ACG to benefit from

its misconduct. By depriving the other parties and the court of necessary discovery,

ACG has fundamentally hampered the ability of a full and fair presentation of PML's

claims. Consequently, ACG should lose its ability to defend against PML. In addition,

the best deterrence for future litigants is removal of the incentive to misbehave in the

way that ACG has shown that it is capable of doing.

Finally, ACG should be required to pay the reasonable attorney fees and costs

that its misbehavior caused PML to incur. *See e.g.*, *In re Tenn-Fla Partners*, 226 F.3d

746, 748-51 (6th Cir. 2000) (awarding attorney's fees for debtor's fraudulent conduct for

providing "misleading and incomplete disclosures," in securing confirmation of its

Chapter 11 reorganization plan); *Telechron, Inc. v. Intergraph*, 91 F.3d 144 (6th Cir.

1996) (upholding sanctions against plaintiff for "litigation conduct . . .  marked by a long

history of noncompliance with discovery requests and court orders, stormy attorney-

client relationships and significant delay"); *Johnson v. Cleveland Heights/University*

*Heights School Dist. Bd. of Ed.*, 66 F.3d 326 (6th Cir. 1995) (affirming district court's

sanction under its inherent authority as well as Rule 37 and 28 U.S.C. § 1925 against

11

plaintiff's attorney "for repeated discovery violations"); *see also In re Heritage Bond Litigation*, 223 F.R.D. 527 (C.D. Cal. 2004) (awarding attorney fees where the defendants' willful failure to produce documents caused clear prejudice to the plaintiffs). Because Gilchrist is proceeding *pro se* on behalf of RTP and only filed concurrences relying largely on the briefing and forensic expert analysis of PML, the court does not believe ACG caused RTP to incur more than *de minimus* cost. PML will file a proposed bill of fees and costs, which the court will evaluate in determining the reasonable fees and costs that ACG should bear.

### B. Motion for Summary Judgment under Federal Rule of Civil Procedure 56

#### 1. Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks

12

whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'").  A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from those facts in a manner most favorable to the nonmoving party.  *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). The court is not to weigh the evidence to determine the truth of the matter, but must determine if there is a genuine issue for trial.  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## 2.  Discussion

In spite of ACG's misconduct during discovery, PML uncovered evidence that, even when viewed in the light most favorable to ACG, presents no issue of material fact concerning whether ACG was involved in either the creation or the storage of the fraudulent documents that are at the heart of this case.  There is thus no question of fact concerning PML's claims against ACG for fraud and breach of contract.

To state a cause of action for fraud under North Carolina law,[9] PML must

---

[9]Section 9L of the Agreement designates North Carolina law as the governing law.  (Agreement at 8, Pl.'s Ex. B.)

13

demonstrate the following elements: (1) false representation or concealment of a material fact (2) reasonably calculated to deceive (3) made with intent to deceive, (4) which in fact does deceive, (5) resulting in damage to the injured party. *Rowan County Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648, 658 (1992) (citation, quotation omitted). Regarding breach of contract, PML must show a valid contract and breach of the terms of that contract. *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). A breach is actionable only if the breach was material, meaning a breach "that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *Long v. Long*, 588 S.E.2d 1, 4 (N.C. Ct. App. 2003) (citation, quotation omitted). The evidence before the court meets the necessary elements for both fraud and breach of contract.[10]

PML found evidence of a document that gave explicit instruction to ACG employees regarding how to create fraudulent certificates of insurance and a fraudulent document that purported, through fax lines types in by ACG, to be a fax from Hartford or RTP.[11]

The document titled "How to produce [sic] a Certificate of Insurance" lists steps for falsifying the fax line and calls for the "signature" of "Michael." (Pl.'s Ex. U.) It also

_____

[10]Because PML offers no specific argument concerning its counts of unjust enrichment and promissory estoppel, the court will not address ACG's arguments regarding those claims. Similarly, the court finds no argument related to PML's claims of conspiracy and conversion.

[11]Apart from its helpful briefing of this issue, PML provided the court, as well as ACG, with a computer disk containing the documents as they were found on ACG's computers, according to the cover letter submitted by PML's counsel. The court has reviewed *in camera* the disk and its contents.

14

instructs the reader to "[s]end RTP a cert request" and to e-mail a request form "to Lauren @ RTP." (*Id.*) Certificates of insurance stored in ACG's computer equipment match the certificates of insurance that PML received by fax purportedly from Hartford and RTP. (Certificates of Insurance, Pl.'s Exs. D & R.) They contain the same font, wording and format, which allowed ACG to manipulate the header and the footer in order to alter the fax lines. (*Id.*) These documents appear to be templates for following the steps in the "How to . . ." document. Matthews concluded that the "template files have a high degree of correlation between the fraudulent cert[ificate]s including details such as the footer text. (10/29/06 Expert Report at 12, Pl.'s Ex. L.)

There can be no question that these "certificates of insurance" were meant to induce PML to think that it had full coverage under the agreement.[12] These certificates purported to cover employees outside of North Carolina. Indeed, ACG promised in the Agreement to "maintain workers' compensation coverage for each PML Employee in accordance with the laws of the states in which ACG provides services under this Agreement." (Agreement at 3, Pl.'s Ex. B.) PML did not know and had no reason to know that ACG was licensed to provide insurance only in North Carolina. (PML's Responses at 5, Pl.'s Ex. A.) The fact that the Agreement by its very terms refers in the plural to "*states* in which ACG provides services," (Agreement at 3, emphasis added),

---

[12]At the hearing, ACG argued that these certificates post-date the signing of the agreement and therefore did not contribute to inducing PML to sign the agreement. However, these same certificates indicated coverage beginning with the signing of the agreement and contributed to an ongoing pattern of ACG assuring PML that its PEOs had full coverage, when in fact that coverage did not exist. Further, as described elsewhere, the very terms of the Agreement, which by logical necessity were drafted before the signing of the Agreement, contain false material representations regarding the coverage that ACG promised to deliver.

15

belies ACG's claim now that PML knew or should have known that ACG's coverage was limited to North Carolina, (ACG Resp. at 1).[13]  In addition, Section 1B of the Agreement is titled "Operation in *States* with PEO Licensing/Registration Requirements[,]" (Agreement at 1, Pl.'s Ex. B, emphasis added), and sets out steps ACG will take to comply with, where applicable, various non-designated states' "statutory requirements[,]" (*id.*).  No part of the Agreement refers to a specific geographic limitation for coverage.

To the extent that ACG argues PML should have done its due diligence and verified the geographic reach of ACG, the court rejects the argument.  In addition to the above contradictory language in the Agreement, the very beginning of the Agreement places the onus of investigation upon ACG.  The relevant language states that "[b]efore entering into this Agreement, PML provided ACG with information to assess whether PML was an appropriate candidate for ACG's services.  PML represents that the information provided was and continues to be accurate and complete as of the Effective Date."  (*Id.* at 1.)  ACG has not argued, and nothing in the record suggests, that PML never told ACG that PML required multi-state coverage.

The court rejects ACG's specious argument that the contract is void and unenforceable, and that summary judgment for PML is therefore inappropriate.  The language of the Agreement does not support ACG's contention that PML knew or

---

[13]Elsewhere, in response to PML's contention that ACG assured PML that it could obtain worker's compensation insurance for PML's PEOs located in various states, (Pl's Br. at ¶3), ACG responds: "Admitted.  ACG admits that it imprudently gave this assurance after being assured by RTP that it could secure the required insurance coverage from the Hartford," (ACG's Resp. at ¶3).

should have known that ACG's coverage was limited to North Carolina. While ACG at
the hearing made reference to self-serving deposition testimony of Brown stating that he
told PML of ACG's geographic limitation, the language of the Agreement as quoted
above specifically contradicts ACG's assertion.[14] Moreover, ACG presents no record
evidence supporting its statement that RTP gave PML "misguided assurances," (ACG's
Resp. at 4), about ACG's ability to provide coverage in several states. The Agreement
further states that it should not be construed against ACG on the basis that ACG drafted
it but instead "shall be viewed as it prepared jointly by ACG and PML. (Agreement at 8,
Pl.'s Ex. B.) Therefore, as sole or even joint drafter of the Agreement, ACG cannot now
be surprised by its express terms.

ACG attempts to argue that the Agreement itself was unlawful because it
presumed to offer coverage ACG was not licensed to provide. But the court is aware of
no law (and ACG cites no such law) preventing ACG from acquiring the proper licensing
to allow it to offer coverage outside of North Carolina. The unlawfulness resides inthe
manner, first, in which ACG entered into a contract that it knew it could not perform,
and, second, in its pattern of conduct designed to disguise its inability to perform. That
failure constitutes both fraud designed to induce PML to enter the Agreement and a
breach of contract subsequent to the signing of the Agreement. The false insurance
certificates were mere ongoing attempts to disguise ACG's fraud and breach of
contract. The record offers no dispute regarding the wilfulness of ACG's materially false

---

[14]In addition, the integration clause of the Agreement states, "[t]his Agreement
constitutes the entire agreement between the parties regarding the subject matter
contained in this Agreement, and supercedes any other agreement or understanding
between them, whether oral or written." (Agreement at 7, Pl.'s Ex. B.)

17

representations and PML's detrimental reliance upon them.  Similarly, the record does not support a finding of a material issue of fact concerning whether ACG breached the contract and caused PML damages, though the amount of damages remains to be proven.

Finally, the court is not persuaded by ACG's argument that the Agreement was not effective until December 14, 2004 because that is the date that an Appendix B was attached to the Agreement.[15]  Appendix B sets out provisions regarding the billing cycle and the schedule of fees.  (*Id.* at 13.)  Nothing in Appendix B addresses the effective date of the Agreement.  The Agreement itself makes clear that the effective date is November 17, 2004, which was typed directly into a field near the very beginning of the document.  (*Id.* at 1.)

As with ACG's attempt to skirt direct response to the discovery violations, the court finds it telling that ACG's written response on the merits is, in essence, to avoid addressing them at all, simply presenting its contract unenforceability argument.  The court views ACG's presentation at the hearing similarly.  ACG's unconvincing argument and its complete lack of foundation in the record, particularly in the express and controlling terms of the Agreement, make futile ACG's attempt to avoid the merits, and, indeed, the language of the Agreement.  Summary judgment for PML's claims of fraud and breach of contract is altogether appropriate.

## IV.  CONCLUSION

---

[15]The effective date is relevant for determining damages, based upon the parties' representations about when a significant claim by PML for a worker's closed-head injury occurred.

18

IT IS ORDERED THAT PML's "Motion for Judgment by Default and [Partial] Summary Judgment Against Defendant ACG" [DKT #85] is GRANTED.  A separate order of default will issue.

IT IS FURTHER ORDERED that summary judgment is appropriate for Counts V and VI.  A separate judgment will issue.

S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  December 20, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 20, 2006, by electronic and/or ordinary mail.

S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522